Filed 1/29/16  P. v. Pantchev CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B258186 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. SA082367) |
| GUEORGUI PANTCHEV, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathryn A. Solorzano, Judge.  Affirmed.

Murray A. Rosenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Bythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

A jury convicted Gueorgui Pantchev of two counts of stalking (Pen. Code, § 646.9, subd. (a)),[1] five counts of dissuading a witness (§ 136.1, subd. (c)(1)), and two misdemeanor counts of disobeying a court order (§ 166, subd. (a)(4)). The court sentenced him to eight years four months in state prison. He challenges his conviction, claiming (1) the trial court erred and violated his constitutional rights when it precluded his treating psychiatrist from giving a lay opinion that appellant did not write the threatening e-mails at issue, (2) the court erred in refusing to give a third party culpability instruction, and (3) cumulative error warrants reversal. We find no errors and affirm.

STATEMENT OF FACTS

## 1.  Prosecution Case

This case stems from appellant's conduct with regard to Dr. Michelle Zeller and Dr. Sharon Gohari, both of whom worked at the United States Department of Veterans Affairs (VA), Veterans Health Administration, West Los Angeles Medical Center (VA hospital) where appellant, a Marine and an Iraq war veteran, was being treated.

## A.  Dr. Zeller

Dr. Zeller was a clinical psychologist and first became aware of appellant in April 2011, when he went to her office, which was located in an area where patients customarily did not go. At the time, Dr. Zeller was meeting with a psychology trainee when appellant stood in the doorway and asked if she was Michelle Zeller. Dr. Zeller was confused because she had never seen or met him before. She asked him to give her a moment while she finished with her student, and she shut the door. The student told Dr. Zeller appellant had gone into restricted areas in another building on the VA campus. Two minutes later when Dr. Zeller opened the door, appellant was down the hall asking a trainee to open his medical file, which staff was not authorized to do. Dr. Zeller asked appellant to leave, and he again asked if she was Michelle Zeller. He would not identify himself. He seemed agitated and angry and said he found Dr. Zeller's name in his medical chart. He left out the back entrance to the building. Dr. Zeller later recalled she

---

[1]     Undesignated statutory citations are to the Penal Code unless otherwise noted.

had signed a note from a psychology trainee in appellant's smoking cessation program when a colleague was on vacation. The next day appellant slipped a "somewhat angry" letter under Dr. Zeller's door, claiming she treated him like "'fodder' you can use to train your students e.g. show your students what a Behavioral Flag is and freak out," which she did not understand.

Over the next two years, appellant sent about 40 e-mails to Dr. Zeller that were, in her view, "harassing, aggressive, threatening, hostile, with very violent images of knives, bombs, torpedoes, cross bones. He even sent some videos of the mob doctor, just very threatening." Prior to September 2, 2011, she had filed a police report. On September 2, 2011, she responded to one of appellant's e-mails, telling him they were "annoying, time-consuming, and distracting from clinical duties," and requesting him to stop sending them. Appellant responded from the e-mail address "usaghp@yahoo.com"—the address he had been using at that time—and identified himself by name, suggested he could stop by her office in person, gave her office location, and mentioned a "predator pray [*sic*]" relationship, which made Dr. Zeller feel uncomfortable and "somewhat threatened." After that, appellant became angrier and his behavior became more severe.

On August 10, 2012, and again on September 14, 2012, Dr. Zeller was named as a protected person in protective orders against appellant. Five days after the first protective order issued, she began receiving e-mails from "hush.com" or "hushmail.com" e-mail addresses that did not identify appellant by name or the e-mail address he had been using. On September 16, 2012, she received two e-mails from "stressedaboutsecurity@hush.com" about 40 minutes apart with nearly the same text. The subject line for both read, "The Mob Doctor - Be careful who you owe." The first one addressed her as "Bitch," and stated in relevant part: "You might put one away for a while but not all for sure. Don't confuse peace with calm before the disaster. [¶] An airhead would bet on 'duty to protect' and the pigs. Are you an airhead? [¶] Next time before you point at someone, think about someone paying you a visit and a 50 caliber weapon that penetra[tes a] bullet proof vest. The pigs won't be able to absorb even a bullet meant for you let alone a collector." The second one also addressed her as "Bitch"

3

and contained the identical text, adding at the end of the last paragraph: "The pigs won't be able to absorb even a bullet meant for you let alone a collector, and will delude yo[u] saying that 50 cal is illegal. Would you like to purchase one? Maybe it will give you a peace of mind, better than the pigs. If so, don't be afraid to talk to a stranger, the stranger might have what you need." The e-mails made Dr. Zeller feel "scared, threatened[,] violated, disrespected." She asked for security in her building, received permission to carry pepper spray with her on the VA campus, and was more vigilant.

On September 18, 2012, Dr. Zeller received an e-mail from the address "dean.norman@hushmail.com" with the subject "Blowjob." The e-mail purported to be from Dr. Dean Norman, the chief of staff at the VA hospital, but identified him as "Chief of Stuff." In previous e-mails appellant sent from his "usaghp" account, appellant referred to Dr. Norman as the "Chief of Stuff." The e-mail stated in relevant part: "May I please at least get a 'blowjob' before I am gone? [¶] Will a bouquet of roses, a bottle of champagne, whatever he offered Dr. Sharon Gohari, and a visit to your house or apartment convince you of my sincere request? [¶] Starting the foreplay out is an option as well. There are plenty of nice and quite [*sic*] places near N. Oakhurst Drive in Be[verly] Hills. [¶] I do not know on which corner of the street I will get hit, in my office, on my way home, in my living room, or in my bedroom. [¶] At this point I do not even know how much longer I will be your chief of stuff. [¶] I have been sticking my neck out for you and for your safety for too long." As discussed more fully below, Dr. Gohari also received this e-mail, and a portion of it addressed her directly: "I am sorry things with you and your patient did not work out and he refused to go out with you and have any more se[x with] you. We all understand that you are enraged with your patient because he refused to go out with you. [¶] Would you please give me a 'blow job' for giving you the peace of mind I did?"

## B. Dr. Gohari

Dr. Sharon Gohari was a physician in the polytrauma clinic, treating traumatic brain injury and other physical injuries at the VA hospital. She first encountered appellant in 2009 when he asked to be seen as a walk-in at her clinic. At the

4

appointment, he kept talking about unrelated matters to keep the appointment from ending. She eventually took him out of the room, and he asked if he could show her his hernia. She felt uncomfortable with the request and referred him to his primary physician. As she met with her next patient, appellant returned to the closed room and said he had other things to discuss with her. She told him he had to leave. He tried to enter the room one more time before leaving.

Dr. Gohari never treated appellant again, but he would occasionally stop her in the halls to ask her questions. One afternoon he asked her to coffee. She refused, telling him the request was inappropriate and not to ask. He said she was supposed to say no as part of her training. She continued walking outside, and he followed her, "kind of invading [her] personal space." To avoid him following her to her car, she stopped and told him she was being picked up. She waited a short time to ensure he was gone before leaving.

In March 2011, appellant slipped what Dr. Gohari called a "manifesto" under her office door, which was located in an area restricted to authorized personnel. It had her name and his name on it, as well as his "usaghp" e-mail address. She turned it over to the VA police.

About a week later, appellant went to an attending room in a restricted area and knocked on the door. Dr. Gohari opened it and saw him holding a copy of something like his manifesto with another doctor's name on it. He asked for that doctor, and Dr. Gohari said she was not there and closed the door. Appellant was not receiving treatment in Dr. Gohari's building at the time, although he regularly parked his distinctive orange Dodge Challenger near her office.

On June 29, 2012, Dr. Gohari's fiancé visited her at her office. As she walked him to his car and hugged him goodbye, she saw appellant's car coming to the parking lot, followed by a police escort. She told her fiancé to leave and started walking to her car in another lot, passing appellant's car. She was wearing black pants and a black top and had her hair in a ponytail. The police officer following appellant at that time had received a report that appellant was on the grounds without signing in, and that he was near Dr. Gohari's building without an appointment.

5

In the ensuing days, appellant sent Dr. Gohari a series of e-mails. On July 1, 2012, appellant sent Dr. Gohari a long e-mail from his "usaghp" e-mail address entitled, "Doctoresse Gohari 'The Red Riding Hood' in Ponytailed in Pitch Black." It had different fonts, sizes, styles, and color, and it referred to Dr. Gohari's appearance when appellant saw her on June 29, 2012 (e.g., "ponytailed," "dresses in pitch black," etc. [boldface, font type & formatting omitted]). It also referred to seeing her with her fiancé ("The way you clung on your fiancee [*sic*] was so cute, genuine revealing desperate need [*sic*]. You spontaneously raised on your toes and lean-pushed forward, very touchy, right when I drove by you. I envy him for that:), which made me think that if you cling on me in such a way, I would have hard [*sic*] time resisting the temptation and remembering you let alone thinking of you are a Sorceress:):):), which I am certain you would gladly do. It seemed as you were clinging and hugging a senseless chump, which neither trembled nor had feelings for you, just as you would hug a tree." [Italics & boldface omitted.]).

The next day appellant sent her another e-mail from his "usaghp" e-mail address entitled, "Doctoresse Gohari Ponytailed Ambush:):):):)," and again referring to her appearance on June 29, 2012 (e.g., "ponytailed," "[d]ressed in pitch black," etc. [boldface, font type & formatting omitted]), as well as her fiancé and the police officer following him.

Appellant sent her another e-mail the next day from the same address, this one entitled, "Matadoresse Doctoresse Sharon Gohari M.D. Blew Me Six Ways From Sunday." He again referred to the June 29, 2012 encounter, now describing how Dr. Gohari jumped in front of his car like a matador, pushed her fiancé out of the way, and challenged appellant to fight. He wrote, "Is this Matadoresse's way of conveying she is open to and accepts 'coffee invitations' and 'parking lot following' ..... and if she does not like the inviter and follower, or if he bores her, she would practice: [¶] 1) Kick His Ass [tab] First [¶] 2) CPR [tab] Second [¶] 3) Castration For Fun [tab] Last Resort." (Boldface & font types omitted.) On the next page he wrote: "Matadoresse Sharon Gohari's [¶] New Treatment Plan For Her Favorite Patient [¶] Sneak up in the dark in G.'s place wake G. up and ask G. to inspect her outfits, swards, guns, knives and hair:

6

[¶] Pss.... Georgy... are you awake.... how is my outfit.... is it ironed.... What about my hair....  Are you awake... go back to sleep.... I'll be back later... I forgot my new white coat..... I am going to change... oh, let me show you how sharp my sward is... See how good I am.... I cut your pillow right by your throat without awaking you... Huss..... Oh, look, see how I cut the comforter between your legs, without cutting the mattress and cutting your balls.... are you OK.... Do you like a cup of water or coffee... if you need a Doctoresse, I know one... Sweet Dreams Sweaty, be back in a jiffy.... I'll bring my guns to.. [¶] Hence replacing his nightmares with more peasant ones. [¶] Also, practice: [¶] [bullet] kill and revive [¶] [bullet] knock and CPR [¶] [bullet] get in and get out undetected." (*Sic.*; boldface, underscoring & font type omitted.)  It ended with the word "cordially."

Dr. Gohari became "extremely frightened" and "unnerved" by this and the prior e-mail.  She started taking self-defense martial arts classes and bought a gun, even though she had been "very anti-gun."

On August 8, 2012, appellant sent Dr. Gohari another e-mail from his "usaghp" e-mail address, entitled "I am a little scared."  A front desk clerk at the clinic named Samuel Mason responded to this e-mail with an e-mail Dr. Gohari felt was "inappropriate."  It stated:  "No sir you are not a trained killer.  You are a shameful, spineless, worthless excuse for a man.  You are the worst kind of punk, who hides behind a computer key board and monitor.  I WISH, I would catch you in the act of harassing my co-worker.  You will find out what a real military man is about.  Now, take this to the staff on the 6th floor, or better yet to your therapist, and cry like a little girl that the mean man in the clinic is after me.  You worthless, smoking pile of horse manure, you are not worth the effort it would take to put you in your place.  MAN UP PUNK."  Mason was disciplined and removed from his position for this e-mail, but was later reinstated at the polytrauma clinic.

Like Dr. Zeller, Dr. Gohari was named in protective orders dated August 10, 2012, and September 14, 2012, against appellant.  She received an e-mail from appellant's "usaghp" address on August 23, 2012.  She also received e-mails from "hush" e-mail

7

addresses, which became "more and more threatening." On August 17, 2012, she received an e-mail from "auto67618875@mac.hush.com," with the subject, "Are men afraid of successful women?" It stated in relevant part: "Do not be surprised if a video of you and your fiancé dressed in black shows a West Los Angeles VA Docto[r] playing 'chicken' and attacking a patient on the parking lot plus a lot more about you and those involved. [¶] 'Stalking charges,' a charming female Doctor as the 'victim' plus female Psychologist and female Psychiatrist, all forming a nasty trio, generating serious offences, requiring serious defense, costing hundred thousands. Do you really think you can fuck someone by falsely imprisoning him, generate losses of over $250,000 and get away with it by a slap on the wrist? [¶] . . . [¶] He played chicken with you while your champ-fiancé was scared shitless next to you, the police was next [to] you, and your co-workers were all watching inside, and no one noticed. Do you remember when he got o[ut of] his car and stepped towards you, and you spontaneously rushed towards him, while your champ-man froz[e] shitless? [¶] He stooped neither because of you nor because of the police. He did not want to intimidate you—a smaller weaker girl, put tears in your eyes and ruin your evening, he had plenty of time to do so and the police would not have noticed anything. He does not want to harm you physically. You and your wimpy man were so disorganized, drawing all kind of attention, that he deliberately drew all of the police attention on him, s[o you] could get away unnoticed, as you two did. [¶] If he could pull this, do you know how much more he can pull? Do not be stupid and get the false sense [of] security. You have no idea what you are up against. You are screwing with the wrong person. You m[ight have] gotten away so far but with this one you will not. Any benefit you have gained by screwing him, will b[e] out plus more and leave you nothing but sorrowed memories." Dr. Gohari felt threatened and frightened by this e-mail. She and her colleagues would watch for appellant's car, avoid going through the front door, walk each other to their cars, take alternate paths, and ask for police escorts.

On September 16, 2012, Dr. Gohari received two nearly identical e-mails within two minutes of each other, and a third similar e-mail about a half hour later. They all

8

came from "stressedaboutsecurity@hush.com" and contained the same subject, "The Mob Doctor - Be careful who you owe." They were nearly identical to the two e-mails Dr. Zeller received on the same day from the same e-mail address, including the same language that, "[n]ext time before you point at someone, think about someone paying you a visit with a 50 caliber weapon that pene[trates a] bullet proof vest. The pigs won't be able to absorb even a bullet meant for you let alone a collector." The third e-mail added: "The pigs won't be able to absorb even a bullet meant for you let alone a collector, and will delude [you] saying that 50 cal is illegal. Would you like to purchase one? Maybe it will give you a peace of mind, better than th[e] pigs. If so, don't be afraid to talk to a stranger, the stranger might have what you need." When she received these e-mails, Dr. Gohari "broke down into tears," called the chief of her department and the police, and took the rest of the day off.

On September 18, 2012, Dr. Gohari received the same e-mail sent to Dr. Zeller from "dean.norman@hushmail.com" with the subject of "Blowjob," and purportedly sent by Dean Norman, "Chief of Stuff." This e-mail made her particularly fearful because it referred to North Oakhurst Drive in Beverly Hills, and she had previously lived on that street.

On September 22, 2012, Dr. Gohari received an e-mail from "edcasey@hush.com" and purporting to be from Ed Casey, the VA Chief of Police. The subject was "Bouncing Your Asses," and it said: "Let's be real. [¶] All we give a shit about is that nothing happens to you at work. As long as nothing happens to you at wor [sic] are covered. We don't give a fuck about what happens to you off the property. [¶] Dr. Norman has ordered extra security for his executive housing and you can take advantage of it. [¶] Bouncing your asses on Dr. Norman's dick and my dick would give you an exclusive pass to the executive housing. The longer you keep our soft dicks hard and the more you bounce your asses on our dicks, the lon[ger] you would stay in the executive housing and be safe. Otherwise, you are on your own, ladies. [¶] A blowjob would convince my men to patrol by your office, houses and apartments instead of watching po [sic] and jerking off while at work. Bouncing your asses on my men's soft

9

dicks and keeping them hard longer, would get my men near you to make sure you feel safe. [¶] Dr. Sharon Gohari, we have heard so much about you. All of us fantasize about you. What was it like for to [*sic*] have sex with your patient? Unlike your patient, we all find you very attractive, especially compared to fat [*sic*] ugly wives, and we would all be privileged to have sex with you. [¶] At least, give us some good time before we get hit." Dr. Gohari again felt terrible and fearful after she received this e-mail.

In all, Dr. Gohari received upward of 50 e-mails from appellant. During this time, Dr. Gohari did not have problems with any other patients and had not received threatening e-mails from anyone else. She had not accused anyone else of harassing or annoying her, and she was not a witness in any other case. She was afraid of appellant at the time and remained that way at trial.

## C. Other Evidence

While being treated at the VA hospital, appellant was restricted from freely moving about the grounds. He initially had to sign in and out with the VA police for appointments, and later had to have a police escort. He was restricted to appointments in only one part of the facility. He failed to comply at times, and when confronted, he became heated, argumentative, and abusive.

VA Police Officer Nathaniel Webb responded to appellant's presence on campus during his June 2012 encounter with Dr. Gohari and her fiancé. After the encounter, he received e-mails from appellant's "usaghp" e-mail address. He was also aware that protective orders had been put in place for Dr. Zeller and Dr. Gohari. On September 16, 2012—the same day Dr. Zeller and Dr. Gohari received the 0.50-caliber "hush" e-mails—he received an e-mail from "auto30752472@mac.hush.com" with the subject, "Ask your investigator and detective if 50 caliber will make a difference hitting you in your chest." It stated, "Asshole, before you fuck someone again, ask your investigator and detective if 50 caliber will make a difference hitting . . . your . . . vest or in your face besides on open versus closed casket ceremony. . . . You stupid six-and-a-half foot piece of shit that fucks with those in need." There was a link to a video clip on YouTube from the movie Full Metal Jacket (Warner Bros. 1987), in which a drill sergeant at boot camp

10

explains the most lethal weapon in the world is a marine with a rifle. After receiving this e-mail, Officer Webb became cautious, altering his routes to and from work and being more aware of his surroundings.

On November 1, 2012, Jose Cisneros, a district attorney investigator, interviewed appellant. Appellant told him he thought the term "chief of stuff" was funny because it reminded him of the television show *West Wing*. He said he thought the term "matadoresse" for Dr. Gohari was funny because when he encountered her in the parking lot with her fiancé, they were both wearing a "black kimono-style ninja suit or outfit" and Dr. Gohari stepped in front of his car to challenge him to a fight, reminding him of a female matador.

The same day as his interview, officers searched appellant's apartment and seized his laptop computer and cell phone. The search did not yield any evidence directly linking appellant to the "hush" e-mails. Appellant's apartment was about 50 yards from the VA hospital.

## 2. Defense Case

Dr. Andrew Shaner was appellant's psychiatrist at the VA Hospital from July 2011 until appellant's arrest in November 2012. He first learned of appellant because he was the chair of the disruptive behavior committee. He took over treating appellant after appellant made it difficult for his current psychiatrist to continue treatment, and no other psychiatrist would take him. Dr. Shaner diagnosed appellant with traumatic brain injury from a head injury he sustained while in Iraq, resulting in lack of attention, posttraumatic stress disorder, and obsessive compulsive disorder. His symptoms worsened over time. He was on about 30 medications in 2012, but Dr. Shaner stopped all of them because they did not appear to benefit him. At one point appellant was excluded from the West Los Angeles VA hospital grounds, but he did not go to another facility because the services he needed were only available at the West Los Angeles location.

Dr. Shaner saw many e-mails from appellant, as well as the "hush" e-mails. According to Dr. Shaner, appellant did not have a history of violence, and Dr. Shaner never felt afraid of him or threatened by him. Appellant explained to Dr. Shaner that the

11

comments others felt were threatening, such as "I know where you live" and "I'm going to torpedo her," simply meant he wanted to destroy their careers, not threaten violence.

Appellant testified in his defense. He immigrated from Bulgaria to the United States in 1993 at age 22 and became a United States citizen in 2004. He joined the Marines in 1999 and was deployed to Iraq in 2003. That same year he was injured by an air blast in Iraq and was honorably discharged. He began developing health problems in 2004 or 2005, including asthma, depression, trouble sleeping, nightmares, neck and back problems, joint problems, and memory and attention issues. He started treatment at the VA hospital. The VA gave him a computer in 2004, and he purchased another computer in 2009, which was confiscated during the search of his apartment. After he returned from Iraq, he graduated from the University of California-Los Angeles, took a graduate admissions test, and attended Johns Hopkins University for graduate business school in 2011. In 2011, he visited the VA hospital several times every day.

Appellant met with Dr. Gohari in 2009. During the examination, she "caress[ed]" and "got close" to him. When she leaned over, a medallion she was wearing with a pentagram fell off. She told him she liked to keep it hidden from patients. Appellant also noticed witchcraft and sorcery books on her desk. He believed a pentagram is a sign a person is a devil worshipper. Dr. Gohari told him he was interesting and she wished she could get to know him better. She said she recently moved to California, was lonely, and her relationship with her significant other was not going well. She asked if he would be interested in going out with her or having a private meeting with her to get to know her. That hit appellant "like a lightening [*sic*]," and he wondered, "[W]hat is this crazy witch going to do with me? Will she cook me up and eat me or sell my body parts as a doctor, or poison me with something, or bring a dead cat or something?" Appellant told her he was concerned about someone finding out, but she told him not to worry because she had her "ways around." She asked if he would like to "show her what [he's] working with," and he was concerned someone would walk in. She said she would say she was examining his hernia, even though he did not have one. He declined. She got "pissed off" and told him to leave.

12

Months later appellant asked Dr. Gohari if she wanted to have coffee with him "inside of the V.A. next to the security guard." He did so because he realized he had insulted and enraged her by turning her down, so he figured he would ask her for coffee to "see which way and how this thing will go."

Appellant denied contacting Dr. Zeller or Dr. Gohari once he received the restraining orders. He denied sending the "hush" e-mails referencing the 0.50-caliber bullets and denied he had any "hush"-related e-mail accounts. His e-mail addresses were "usaghp" at yahoo.com and gmail.com. He sent e-mails to his providers because he did not want anyone to "twist" around what happened with Dr. Gohari, like Dr. Gohari did, which got him flagged. He claimed he sent "way more than 50" e-mails to Dr. Zeller, Dr. Gohari, and others. He also claimed neither Dr. Gohari nor Dr. Zeller told him to stop e-mailing them, although he acknowledged Dr. Zeller's e-mail to that effect. He continued to include her on e-mails because he did not want to talk about her behind her back. He testified he heard Dr. Gohari enjoyed some of his e-mails. He also explained he accidentally referred to Dr. Norman as "chief of stuff," but felt it suited him, so he used the term in a couple of e-mails before correcting it. He referred to Dr. Gohari as "matadoresse" due to the incident when she "played chicken" with his car in the VA parking lot.

When appellant told other doctors Dr. Gohari falsely accused him of following her to her car and asking to have sex with her, they laughed at him, so he became worried and began regularly reading his medical records. He saw Dr. Zeller's name and e-mailed her, but she did not respond. He then went to see her to ask why "she's digging in my chart."

After Dr. Shaner took him off certain medications in 2012, he had problems with concentration, depression, collecting his thoughts, formulating sentences, memory, sleep, appetite, communication, and getting along with people.

## DISCUSSION

### 1. Exclusion of Dr. Shaner's Lay Opinion

Appellant contends the trial court erred and violated his rights to due process and to present a defense when it granted the prosecution's request to prohibit Dr. Shaner from

13

offering his lay opinion that a comparison of the characteristics of the "hush" e-mails (i.e., the e-mails from e-mail addresses at hush.com, hushmail.com, and mac.hush.com that did not bear appellant's name) and the e-mails signed by appellant from his "usaghp" e-mail addresses showed appellant did not write or send the "hush" e-mails. We disagree.

*A. Procedural Background*

Before Dr. Shaner testified, the prosecution sought to prevent Dr. Shaner from offering his belief that appellant did not write the "hush" e-mails, arguing his opinion was irrelevant and the jury could make the same determination by reviewing the "hush" e-mails and the "usaghp" e-mails in evidence. Defense counsel argued Dr. Shaner could give his lay opinion that appellant did not write the "hush" e-mails based upon his familiarity with appellant's writing style. He would explain the "hush" e-mails did not have the identifiers in appellant's other e-mails, such as the type of font, underscoring, boldface, and different types of characters defense counsel claimed were appellant's "signature quality." The court worried, however, that was not an area of Dr. Shaner's expertise and his lay opinion would not assist the jury because defense counsel could make the same argument to the jury based on the e-mails in evidence. The court also worried it would create a collateral trial if Dr. Shaner's opinion was based on a body of e-mails appellant sent to him that were not before the jury.

Defense counsel cited Evidence Code section 1416, which provides in relevant part: "A witness who is not otherwise qualified to testify as an expert may state his opinion whether a writing is in the handwriting of a supposed writer if the court finds that he has personal knowledge of the handwriting of the supposed writer." The court noted that section usually applies by looking at the handwriting itself or the style and word choice. Defense counsel reiterated that Dr. Shaner would testify that appellant would use different fonts, colors, and the closing of "cordially" in the e-mails he signed, whereas the "hush" e-mails did not have those characteristics. The court believed the issue implicated Evidence Code section 352 because the question was whether the jury should hear Dr. Shaner's opinion about communications from appellant to a psychiatrist who treated

14

him for a long period of time, versus his communications with Dr. Zeller, who never treated him, and Dr. Gohari, who treated him once. Counsel asked why Dr. Shaner could not give opinion about the author of the "hush" e-mails but the victims in the case could give their opinions that the "hush" e-mails were from appellant. The court pointed out their beliefs and state of mind were at issue on the stalking offenses. The court postponed further discussion.

Later, the prosecution clarified the six e-mails forming the basis for the dissuading a witness counts (§ 136.1, subd. (c)(1)) were the six "50 caliber" "hush" e-mails sent on September 16, 2012, to Dr. Zeller, Dr. Gohari, and Officer Webb (the count involving Officer Webb was dismissed during trial). The court reviewed the content of those e-mails and recognized there were differences in style between the "hush" e-mails and the e-mails signed by appellant from his "usaghp" e-mail addresses, but there was "an emphasis, a way of communication" in both sets of e-mails that could support a jury inference the "hush" e-mails were written by appellant. The court found this was a factual issue to be resolved by the jury and Dr. Shaner's lay opinion was not helpful to that issue. When defense counsel emphasized Dr. Shaner's testimony would be based on his "perceptions," the court noted the "relevant perceptions in this case are the perceptions of the jurors based on the evidence that's admitted on the issues in the case." Because part of Dr. Shaner's perceptions would be based on a body of e-mails from appellant not admitted in the case, the court found Dr. Shaner's opinion would be confusing, misleading, create a collateral issue, and consume an undue amount of time.

The court then reviewed two e-mails Dr. Shaner had received from appellant that had been admitted in the case. It noted the writing style used boldface and underscoring, quotations, and smiley faces, but concluded Dr. Shaner's testimony was unnecessary for the jury to draw an inference that the "hush" e-mails were not authored by appellant because of the significant stylistic differences, which "can be observed by any lay person." The court reasoned "the jurors can look at the emails and they can draw the inferences that they think are appropriate under the circumstances and under the law. [¶] So under [Evidence Code section] 352, I find that the probative value is substantially

15

outweighed by undue consumption of time, creating a substantial confusion of the issues, misleading the jurors, et cetera.  So for that reason I'm not going to allow Dr. Shaner to testify on that particular point."

The court revisited the issue during Dr. Shaner's testimony.  At sidebar, the court reiterated Dr. Shaner could give his opinions as a doctor who treated appellant, but his observations as to the font style of the e-mails were not relevant:  "[T]he jurors do not need to know Dr. Shaner's opinion in order for them to reach a decision in this case.  His opinion . . . would simply be the opinion of any layperson like them.  He's adding nothing.  He has no expertise with regard to fonts, and if a font was at issue, as to whether or not the font used in his email versus the font used in particular emails that are at issue in this case; if for some reason there was something that he could add, then we can talk about that.  But there is nothing.  There is nothing that he can add to that."  Although defense counsel pointed out he was not asking for Dr. Shaner's opinion, the court reiterated even his observations were not relevant.

*B.  Analysis*

The trial court excluded Dr. Shaner's testimony pursuant to Evidence Code section 352, which states:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  We review the court's exclusion of evidence under Evidence Code section 352 for abuse of discretion.  (*People v. Brown* (2003) 31 Cal.4th 518, 547.)  We find none.

"If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is:  [¶]  (a)  Rationally based on the perception of the witness; and  [¶]  (b) Helpful to a clear understanding of his testimony."  (Evid. Code, § 800; see *People v. Farnam* (2002) 28 Cal.4th 107, 153.)  The trial court correctly noted Dr. Shaner had no special knowledge or experience in analyzing the use of fonts and typefaces in e-mail, so he could only give his lay opinion that the "hush" e-mails did not appear similar to the e-

16

mails bearing appellant's name and "usaghp" e-mail addresses. But defense counsel did not point to anything specific or unique in Dr. Shaner's communications with appellant that would have demonstrated appellant did not write and send the "hush" e-mails. Instead, counsel relied on the differences apparent simply by reviewing the "hush" e-mails and the e-mails bearing appellant's name and "usaghp" e-mail addresses. As the court recognized, the jury was equally equipped to compare the two sets of e-mails and draw the inference it felt was supported by the evidence. Thus, Dr. Shaner's opinion about the similarities and differences in the two sets of e-mails would not have been "[h]elpful to a clear understanding of his testimony" or helpful to the jury's resolution of the case. (Evid. Code, § 800, subd. (b).)[2]

The court also properly found Dr. Shaner's opinion risked jury confusion, wasting trial time, and misleading the jury. If Dr. Shaner's opinion was based on e-mails not introduced into evidence, the court would have had to conduct separate proceedings, which would have wasted trial time and risked confusing the jury about a collateral issue. Even if Dr. Shaner's opinion was based on e-mails introduced into evidence, his opinion would have been cumulative of the two sets of e-mails already introduced. Also, Dr. Shaner's position as appellant's psychiatrist might have led the jury to give his opinion undue weight, even though he had no particular expertise on whether the e-mails themselves were written by the same person. Despite appellant's contrary argument, there was nothing improper about the trial court allowing Dr. Zeller and Dr. Gohari to testify about the author of the "hush" e-mails but excluding Dr. Shaner's testimony. Dr. Shaner was not a victim in this case, whereas Dr. Zeller and Dr. Gohari were, making their beliefs and states of mind relevant. Thus, the court did not abuse its discretion in excluding Dr. Shaner's lay opinion.

---

[2] Appellant cites Evidence Code section 1416 in his opening brief, but only presents substantive argument under that provision in his reply brief. The contention is therefore forfeited. (*People v. Alexander* (2010) 49 Cal.4th 846, 922.)

17

Nor did the exclusion of Dr. Shaner's opinion violate appellant's rights to due process and to present a defense. "'"As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense."'" (*People v. Lucas* (2014) 60 Cal.4th 153, 270, disapproved on other grounds by *People v. Romero* (2015) 62 Cal.4th 1, 53, fn. 19.) Here, appellant had ample opportunity to present his defense that he did not write and send the "hush" e-mails through other evidence, including his own testimony, and argument by his counsel. Nothing about the application of the standard rules of evidence in this case affected his constitutional rights.[3]

## 2. Refusal to Give Third Party Culpability Instruction

Appellant argues the trial court erred in refusing to give a third party culpability instruction. We find neither error nor prejudice.

### A. Procedural Background

As discussed above, appellant sent Dr. Gohari an e-mail from one of his "usaghp" e-mail addresses, entitled "I am a little scared," to which front desk clerk Samuel Mason angrily responded, resulting in Mason's discipline and removal from his position. During a conference on the jury instructions, defense counsel requested the following instruction on third party culpability based on that evidence: "The People have the burden to prove beyond a reasonable doubt that the defendant is the person who committed the act of witness intimidation. The defendant does not have to prove that another person committed the crime. You've heard evidence that another person may have committed the crime. If after considering all the evidence, you have a reasonable doubt that the defendant was the one who committed the crime, you must give the defendant the benefit of that doubt and find him not guilty."

Defense counsel theorized that the evidence that the "hush" e-mails were widely disseminated, appellant was "widely loathed and despised at the V.A.," and Mason

---

[3]  Respondent argues Dr. Shaner's testimony was inadmissible pursuant to Evidence Code section 1523, subdivision (a), which provides that "oral testimony is not admissible to prove the content of a writing." Because we have concluded Dr. Shaner's lay opinion was properly excluded for other reasons, we need not address this contention.

18

responded harshly to one of his e-mails resulting in his discipline, demonstrated someone other than appellant—and in particular, Mason—may have sent the threatening "hush" e-mails to frame him. Counsel further noted evidence directly implicating Mason would have come through Dr. Shaner's opinion that he believed Mason wrote the "hush" e-mails, but the court had precluded that testimony.

The court noted defense counsel had not advanced this theory during trial. The court also pointed out a third party culpability instruction is usually based on evidence that another person had the motive to commit the crime charged and circumstantial evidence connecting that person to the crime, and there was no evidence of that in this case. The court reviewed the testimony about Mason's e-mail and concluded there was no evidence linking him to the "hush" e-mails. The court therefore denied defense counsel's requested instruction.

In closing, defense counsel argued there was no direct evidence linking appellant to the "hush" e-mails, even though police searched his electronic devices, and Mason or someone else could have easily sent the "hush" e-mails, given "there was a lot of animosity at the V.A. and there were a lot of people who did not like" appellant.

*B. Analysis*

"An accused may defend against criminal charges by showing that a third person, not the defendant, committed the crime charged. He has a right to present evidence of third party culpability where such evidence is capable of raising a reasonable doubt as to his guilt of the charged crime. But evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice; there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v. Mackey* (2015) 233 Cal.App.4th 32, 110-111 (*Mackey*).) With regard to instructions, "'"'in appropriate circumstances,' a trial court may be required to give a requested instruction that pinpoints a defense theory of the case by, among other things, relating the reasonable doubt standard of proof to particular elements of the crime charged.'"'" (*Id.* at p. 111.) But "'a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or

19

potentially confusing [citation], or if it is not supported by substantial evidence [citation].'" (*Ibid.*)

Here, appellant's requested third party culpability instruction was not supported by substantial evidence. Despite Mason's angry and "inappropriate" e-mail to appellant, appellant offered no evidence linking Mason or anyone else to the "hush" e-mails. Appellant suggests he could have offered Dr. Shaner's opinion that he suspected Mason sent the "hush" e-mails and Mason's response e-mail resembled the "hush" e-mails, but, as the trial court noted, appellant never raised that theory during trial. Even if he had, the court would have properly excluded that opinion just as it properly excluded Dr. Shaner's opinion that appellant did not write the "hush" e-mails. Appellant also suggests the instruction was warranted because Mason's e-mail and the "hush" e-mails were "similar[] in tone" and Mason had access to Dr. Gohari's and others' VA e-mail addresses. Yet, appellant fails to explain how the e-mails were in fact "similar[] in tone" or why having access to VA e-mail addresses implicated Mason or anyone else, especially given appellant obviously had similar access. At best, the evidence suggested Mason or someone else might have had a motive to frame appellant, but that was insufficient to justify giving a third party culpability instruction. (*Mackey, supra*, 233 Cal.App.4th at p. 110.)

Even if the trial court erred in refusing to give this instruction, appellant suffered no conceivable prejudice. Generally, third party capability instructions "add little to the standard instruction on reasonable doubt," and "their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof." (*People v. Hartsch* (2010) 49 Cal.4th 472, 504; see *Mackey, supra*, 233 Cal.App.4th at p. 111.) Here, the jury was properly instructed on the reasonable doubt standard based on CALCRIM No. 220, and the instructions on the substantive crimes stated the jury had to find "the defendant" satisfied the elements. If the jury believed Mason or someone else sent the "hush" e-mails, it had the proper instructions upon which to acquit appellant. (*Mackey, supra*, at p. 112.) Further, the jury

20

had both the "hush" e-mails and Mason's e-mail in evidence, and defense counsel was permitted to argue in closing that Mason or someone else could have easily sent the "hush" e-mails to frame appellant, given "there were a lot of people [at the VA] who did not like" him.  Thus, any possible error was harmless.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

### 3.  *There Was No Cumulative Error.*

Because we have found no errors, there was no cumulative error warranting reversal.

## DISPOSITION

The judgment is affirmed.


FLIER, J.

WE CONCUR:


RUBIN, Acting P. J.


GRIMES, J.